IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 18-cv-01816-RBJ

WENDY J. RUNDLE,

    Plaintiff,

v.

ANDREW SAUL, Commissioner of Social Security,

    Defendant.

## ORDER AFFIRMING DENIAL OF BENEFITS

This matter is before the Court on review of the Social Security Administration ("SSA") Commissioner's decision denying claimant Wendy J. Rundle's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Jurisdiction is proper under 42 U.S.C. § 405(g). For the reasons explained below, the Court affirms the Commissioner's decision.

## I. STANDARD OF REVIEW

A person is disabled within the meaning of the Social Security Act only if her physical and/or mental impairments preclude her from performing both her previous work and any other "substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2). To be disabling, a claimant's conditions must be so limiting as to preclude any substantial gainful work for at least twelve consecutive months. *See Kelley v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995).

This appeal is based upon the administrative record and the parties' briefs. In reviewing a final decision by the Commissioner, the District Court examines the record and determines

whether it contains substantial evidence to support the Commissioner's decision and whether the Commissioner applied correct legal standards. *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996). The District Court's determination of whether the ruling by the Administrative Law Judge ("ALJ") is supported by substantial evidence "must be based upon the record taken as a whole." *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). A decision is not based on substantial evidence if it is "overwhelmed by other evidence in the record." *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988). Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Reversal may be appropriate if the Commissioner applies an incorrect legal standard or fails to demonstrate that the correct legal standards have been followed. *Winfrey*, 92 F.3d at 1019.

## II. BACKGROUND

### A. Factual Background.

Ms. Rundle was born on November 17, 1972 and was 44 years old at the time of the ALJ's ruling. R. 129. Ms. Rundle alleges that her disability began on May 15, 2013. *Id.* Two significant events contributed to plaintiff's alleged disability – an automobile accident in January 2012 and an armed robbery at plaintiff's place of employment in August 2012. R. 293, 499–502.

In January 2012 plaintiff was involved in a serious automobile accident causing plaintiff to suffer from daily headaches and short-term memory loss. Plaintiff sought treatment for these symptoms and continued working. R. 499–502. Medical examinations subsequent to this accident note plaintiff had normal insight and judgment, appropriate mood and affect, and did not show signs of anxiety. R. 499–505. A computerized tomography ("CT") scan taken at the time of the accident was normal. R. 500. Plaintiff was eventually diagnosed with post-concussion syndrome, a traumatic brain injury ("TBI"), due to this accident. R. 455.

In August 2012 plaintiff was the victim of an armed robbery at her place of employment, Smoker Friendly, during which a robber pointed a gun at her chest. R. 293. Thereafter, plaintiff sought medical treatment for agoraphobia, trouble sleeping, nightmares, and anxiety, all of which resulted from the robbery. *Id.* Plaintiff was treated by Dr. David Hopkins, Ph.D., who found that she was suffering from "significant anxiety and depression related to her attempted robbery." R. 294. Dr. Hopkins diagnosed plaintiff with acute stress disorder and recommended psychotherapy. R. 294–95. Treatment notes show that plaintiff responded well to relaxation exercises and experienced waxing and waning of her acute stress symptoms through the end of 2012. *Id.* During this time plaintiff was also treated by Dr. Daniel Peterson, M.D., who found plaintiff anxious but not experiencing acute distress. R. 455. Dr. Peterson opined that plaintiff was suffering from post-traumatic stress disorder ("PTSD"), anxiety, and depression. He prescribed several medications to address these issues. R. 451, 456. Plaintiff was wary of taking all of her medications, fearing that she would become dependent on them. R. 451. She chose not to refill some of these prescriptions when they ran out. *Id.* Dr. Peterson ultimately discharged plaintiff from his care in January 2013 due to non-compliance. R. 450.

Plaintiff continued to suffer from depression and anxiety throughout 2013 but began to complain of worsening symptoms after stopping some of her medications. R. 297. A CT scan taken in July 2013 was once again normal. R. 408. Plaintiff resumed treatment with Dr. Peterson in May 2013 and began slowly improving. R. 444–48. Dr. Peterson noted that plaintiff was still reluctant to take her medication, though she claimed that the medication caused no side effects. *Id.* He also noted that plaintiff was involved in physical therapy, feeling better, and responding well to Cognitive Behavioral Therapy with Dr. Hopkins. *Id.* Though plaintiff could not sit still and jiggled her leg through a few appointments, Dr. Peterson determined that plaintiff

was not in acute distress.  R. 440–44.  During this time Dr. Hopkins opined that plaintiff's acute stress disorder had progressed to PTSD.  R. 292.  He recommended that plaintiff reevaluate the efficacy of her medications with a psychiatrist and continue psychotherapy.  *Id.*

Plaintiff also began seeing Dr. Robert Kleinman, M.D., for anxiety in 2013.  R. 302.  Dr. Kleinman noted plaintiff was depressed, anxious, and fidgety.  R. 305.  He also noted that plaintiff had intact remote and recent memory; intact concentration and attention; good judgment; and a cooperative attitude.  *Id*.  He opined that plaintiff's symptoms were moderate and that plaintiff had moderate difficulty with "social/occupational functioning."  R. 306.

In 2014 plaintiff had consistently normal physical evaluations demonstrating normal coordination and gait; she was also consistently found to have normal mood, affect, behavior, and speech.  R. 467, 471, 474.  During this time CT scans of plaintiff's head were normal, though a Magnetic Resonance Imaging ("MRI") scan showed some white matter changes.  R. 487, 490.  Plaintiff also continued treatment with Dr. Peterson who found plaintiff's symptoms were improving with prescribed medication, and that she was "overall much better."  R. 438.  Plaintiff stated that she was experiencing no side effects from medications and only rarely experiencing nightmares.  *Id.*  Importantly, plaintiff also stated that she had "not been working because she chose not to work."  *Id.*  During this time plaintiff missed several appointments with Dr. Kleinman and Dr. Hopkins which she attributed to forgetfulness caused by her TBI.  *Id.*  Dr. Peterson recommended that plaintiff continue her prescribed medication and psychotherapy, but ultimately opined that plaintiff had achieved maximum medical improvement.  *Id.*  He released plaintiff from his care with "no permanent impairment."  *Id.*

A 2014 neuropsychological evaluation with Dr. Michael Nunley, Ph.D., showed plaintiff was cooperative, fairly well-focused, and not easily distracted.  R. 336.  Dr. Nunley

4

recommended physical therapy for plaintiff's headaches and disequilibrium issues, an evaluation by a Speech Language Pathologist ("SLP") for her language and memory issues, and a neuro-optometric evaluation for her visual disturbances. R. 337–38. Plaintiff then attended physical therapy from July to August 2014. R. 351–59, 387–91. Plaintiff's August 2014 SLP evaluation found that she had cognitive-linguistic deficits in the areas of attention, memory, problem-solving, and word finding. R. 355. After a few weeks of therapy with the SLP plaintiff had "demonstrated improvement" and had made "qualitative gains." R. 364. Additionally, in September 2014 plaintiff saw Dr. Thomas Wilson, O.D., for an ophthalmologic examination; Dr. Wilson diagnosed plaintiff with hyperopia (farsightedness), astigmatism (a common condition in which the eye is not completely round), visual distortions of shape and size, smooth pursuit movement deficiencies (difficulty tracking a moving object), and amblyopia (lazy eye). R. 327. Dr. Wilson recommended prism glasses as well as visual and occupational therapy for plaintiff's smooth pursuit movement deficiencies. R. 362.

August and September 2014 follow-up visits with Dr. Nunley showed that plaintiff was experiencing anxiety and that her leg was constantly moving throughout their sessions. R. 339–44. Plaintiff attributed this increased anxiety to several stressors in her life, including the proximity of the anniversary of the armed robbery, significant health issues of family members, her car breaking down, and an increased number of people living in her home. R. 339, 370. Dr. Nunley opined that these stressors were "likely activating her [PTSD] symptoms." *Id.* After a significant gap between appointments, Dr. Nunley discharged plaintiff in December 2014. R. 370.

Through the end of 2014 plaintiff was found to have appropriate mood and affect, as well as normal balance, insight, and judgment. R. 513–26. During this time plaintiff stated that her

5

mood was "good" and that she "fe[lt] happier." R. 528–29.  Plaintiff complained of numbness in her hands and lips which Lisa Navarro, PAC, determined was a likely result of plaintiff's abrupt discontinuation of her medications.  R. 528.  Additionally, plaintiff experienced weight gain during this time, though no metabolic issues were found.  R. 528, 538.  Plaintiff was encouraged to diet and exercise to address this issue.  *Id.*

Plaintiff's complaints regarding numbness, headaches, memory issues, and balance issues continued into 2015, though plaintiff's neurological evaluations were consistently normal.  R. 554–56, 562–63.  Plaintiff also was found to have normal coordination, sensation, reflexes, gait, and station, with only mildly impaired cognitive functioning.  *Id.*  Dr. Nunley further confirmed these findings in mental examinations, noting that plaintiff had "fairly well focused" attention and "was not highly distractible."  R. 578.  Dr. Nunley also noted that plaintiff was exhibiting some signs of anxiety, such as "tapping her legs . . . [and] squirming somewhat in her chair."  R. 579. Plaintiff experienced short-lived ailments through the remainder of 2015, including pain in her lower back, shoulder, chest, and hip; hemorrhoids; anemia; shortness of breath; and light-headedness.  R. 650–55; 862; 879; 934.

In 2016 plaintiff underwent hernia repair but otherwise had normal physical evaluations. R. 671–72; 680–82; 689.  Plaintiff also was repeatedly found to have normal coordination, gait, mood, affect, and judgment, as well as intact recent and remote memory.  R. 680–81, 686, 689–90.  During this time plaintiff discontinued all but one of her medications, stating that they were not helping her.  R. 677–78, 693.  As a substitute, plaintiff consumed marijuana against medical advice to reduce her anxiety and aid her sleep.  R. 27, 677.  Plaintiff then underwent further mental health treatment with therapy which continued into 2017.  Therapy notes show that plaintiff sometimes demonstrated signs of anxiety, such as bouncing her leg, but this activity was

6

reduced when plaintiff played with stress-relieving objects. R. 727, 732, 737. During this time plaintiff also complained about an excoriation disorder, a behavior consisting of picking at one's skin, though this behavior decreased dramatically within a few months. R. 767, 786, 795, 817, 825.

### B. Procedural Background.

Ms. Rundle filed for Title II DIB and Title XVI SSI on December 16, 2014. R. 18. After the SSA denied plaintiff's initial application on April 15, 2015, she requested a hearing which was held before ALJ Lyle Olson on April 25, 2017. R. 18, 37–77. An impartial vocational expert ("VE"), James Miller, testified at the hearing, and plaintiff was represented by counsel. R. 18. The ALJ issued an unfavorable decision on May 18, 2017. R. 15–36. Ms. Rundle then asked the Appeals Council to review the ALJ's decision, a request that was denied on May 18, 2018. R. 1–5.

Ms. Rundle filed a timely complaint and petition for review in this Court on July 18, 2018. ECF No. 1. Shortly thereafter, she submitted an opening brief arguing that the ALJ failed to properly evaluate the totality of her mental and physical limitations and therefore issued a decision based in legal error. ECF No. 20. The Commissioner responded to Ms. Rundle's brief, ECF No. 21, and Ms. Rundle filed a reply, ECF No. 22. This appeal is now ripe for review.

### C. The ALJ's Decision.

After evaluating the evidence of Ms. Rundle's alleged disability according to the SSA's standard five-step process, the ALJ issued an unfavorable decision. R. 15–36. At step one, the ALJ determined that Ms. Rundle had not engaged in substantial gainful activity since May 15, 2013, the alleged disability onset date. R. 20. At step two, the ALJ found that Ms. Rundle had the following severe impairments: obesity; post-concussive syndrome, including, but not limited,

7

to head pain, mild visual disturbances, mild impaired balance, and mild cognitive residuals; right carpal tunnel syndrome; PTSD; and a major depressive disorder. R. 21. The ALJ found the following nonsevere conditions: lower gastrointestinal bleed, hemorrhoids, and left inguinal hernia. *Id.* At step three, the ALJ determined that Ms. Rundle's impairments did not meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404. 1525, 404.1526, 416.920(d), 416.925, and 416.926). *Id.*

The ALJ found that Ms. Rundle had an RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except that she could only lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit, stand, and/or walk with normal breaks for a total of 6 hours in an 8-hour workday; frequently handle, finger, and feel with her right hand; occasionally engage in the operation of foot controls; occasionally climb ramps and stairs, but never ladders or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and never work at unprotected heights, with dangerous moving mechanical parts, or on vibrating surfaces. R. 24. Visually, Ms. Rundle could see to avoid ordinary hazards in the workplace, view a computer screen, read material with a font consistent with ordinary newspaper and book print, and determine the differences in shape and color of small objects. *Id.* Mentally, Ms. Rundle could understand, remember, and complete short, simple instructions; interact appropriately with supervisors and coworkers on an occasional basis and with the public on a rare basis; respond appropriately to changes in a routine work setting only; and make judgments on only simple work-related decisions. *Id.*

In coming to this conclusion, the ALJ gave great weight to the opinion of Dr. Carol Phelps, M.D., a state agency medical consultant, who concluded that Ms. Rundle was physically limited to a light range of work, but must avoid unprotected heights and climbing ladders, ropes,

or scaffolds. R. 28. Dr. Phelps considered Ms. Rundle's subjective complaints regarding head pain and balance issues alongside her normal neuromuscular examination, positive response to medication for headaches, and normal CT scans. R. 29. The ALJ assigned partial weight to the opinion of Dr. Anne Naplin, Ph.D., a state agency psychological consultant, who found that Ms. Rundle retained the ability to perform work not involving significant complexity or judgment. *Id.* Dr. Naplin also found that plaintiff could respond appropriately to supervision and interact appropriately with coworkers, though her interaction with the public should be minimal. *Id.* The ALJ imposed more significant limitations than those determined by Dr. Naplin to better align Ms. Rundle's RFC with her anxiety disorder, depression, and mild cognitive issues. Thus, the ALJ restricted plaintiff to only occasional interaction with coworkers and rare interaction with the public. *Id.*

Plaintiff asserts that the Commissioner's step five finding that she could perform the jobs identified by the VE is not supported by substantial evidence because the ALJ only considered evidence favorable to his decision. According to plaintiff, the ALJ's improper evaluation of evidence led to an erroneous and incomplete representation of her mental and physical limitations to the VE, causing the VE to identify jobs she is not actually able to perform. Plaintiff points to specific areas where the ALJ failed to properly evaluate evidence, including her concentration and attention limitations, excoriation disorder, visual disturbances, and obesity. I will address each in turn.

### III. DISCUSSION

#### A. <u>Concentration and Attention Limitations</u>.

Plaintiff argues that the ALJ's finding that she could maintain sufficient concentration during a regular workday on a sustained basis is not supported by substantial evidence because

the ALJ failed to properly consider evidence of her anxiety, fatigue, lack of motivation, and sleep issues. Plaintiff points to several instances of manifested anxiety in the record, including where medical personnel noted that plaintiff was "fidgety and agitated," "obviously anxious . . . and near panic," with her body "in constant motion [and] her leg bouncing." ECF No. 20 at 1 (citing R. 311, 442, 509). Plaintiff also referenced instances when she complained of fatigue, lack of motivation, and sleep issues. *Id.* Plaintiff claims that these referenced instances belie the conclusion that she could maintain proper concentration and attention during an eight-hour workday and also interact appropriately with coworkers, as these symptoms were exhibited during medical appointments lasting only a few hours. *Id.* at 2.

I respectfully disagree with plaintiff. While her references are accurate, they do not represent the record as a whole and thus do not carry the weight plaintiff is asserting. Regarding concentration and attention limitations, the ALJ found that plaintiff has "a moderate overall degree of limitation to independently, appropriately, and effectively concentrate." R. 23. To support this finding the ALJ referred to psychiatric evaluations showing plaintiff consistently exhibited "intact concentration" and adequate attention to proceed through interviews with medical providers despite her complaints of moderate to extreme difficulty concentrating. *Id.* Regarding limitations stemming from anxiety issues, the ALJ found that plaintiff "has a moderate overall degree of limitation in [her] ability to independently, appropriately, and effectively interact with other[s] . . . on a sustained basis." *Id.* The ALJ supported this finding with evidence that plaintiff interacted well with medical providers, "demonstrat[ing] a cooperative and pleasant attitude, fair insight, and good judgment." *Id.* Additionally, the ALJ referenced plaintiff's social engagement with friends and family, as well as her ability to get along with coworkers and supervisors in the past. *Id.*

The ALJ's decision not to specifically reference plaintiff's anxiety, fatigue, lack of motivation, and sleep issues in the context of her ability to concentrate and interact with others was not harmful to plaintiff given the breadth of evidence supporting his findings. Importantly, the medical records referenced by plaintiff include repeated findings that plaintiff was attentive, had intact concentration, and was not easily distractible; she also was noted to be cooperative with an appropriate mood and affect despite these issues. R. 311, 578. These records feature plaintiff's statements that she "fe[lt] better" and was "improving," attributing periods of increased anxiety to temporary life stressors. R. 442, 542. Additionally, a significant number of plaintiff's references to instances of anxiety occurred prior to 2016 when plaintiff began therapy to address her mental health issues. Finally, therapy notes show that plaintiff responded well to relaxation exercises and medication, the combination of which reduced her anxiety to a "baseline" level. R. 737, 755, 845. Accordingly, I find that substantial evidence supports the ALJ's determination of plaintiff's concentration and attention limitations.

### B. Limitations Arising from Excoriation Disorder.

Plaintiff also argues that the ALJ's finding that she could perform work with handling and fingering requirements is not supported by substantial evidence because the ALJ failed to consider her excoriation disorder. ECF No. 20 at 3. I disagree and find that the ALJ's failure to specifically address this disorder is not harmful. Though plaintiff is correct that the record reflects her struggles with this disorder, the record as a whole shows plaintiff engaged in this behavior for only a short time before it dramatically decreased. R. 767, 786, 795, 817, 825. Additionally, no medical provider found this behavior would interfere with plaintiff's ability to work or interact with others. Given the limited evidence on this short-lived issue, I find that the

ALJ did not commit error by not giving plaintiff's excoriation disorder more weight in determining her RFC.

C. **Limitations Arising from Visual Disturbances.**

Plaintiff argues that the ALJ's finding that she could determine the differences in shape and color of small objects is not supported by substantial evidence because the ALJ failed to consider Dr. Wilson's findings of her visual distortions of shape and size and smooth pursuit movement deficiencies. ECF No. 20 at 3–4. According to plaintiff, these issues affect her ability to engage in depth perception and accommodation, two abilities frequently required for the jobs identified by the VE. *Id.* at 4. I am not persuaded. The record as a whole substantiates the visual limitations determined by the ALJ, which he supported with plaintiff's statement that her vision was "okay," and that it did not interfere with her ability to drive or complete household tasks. R. 28. The ALJ also referenced plaintiff's use of prism glasses, a recommendation from Dr. Wilson to address her visual distortions of shape and size and smooth pursuit movement deficiencies. *Id.* The record demonstrates that plaintiff's use of these glasses helped to address these issues. *Id.* Importantly, no medical provider limited plaintiff's work or daily activities based on her visual issues. Given the record's limited reference to plaintiff's visual disturbances, substantial evidence supports the ALJ's findings of plaintiff's visual abilities.

D. **Limitations Arising from Obesity.**

Plaintiff also argues that the ALJ erred in failing to consider whether her obesity contributed to or exacerbated her mental impairments. ECF No. 20 at 4–5. Again, I am not persuaded. Given the record's limited references to plaintiff's obesity and the ALJ's specific incorporation of obesity in determining plaintiff's RFC, the ALJ's failure to explicitly discuss

this issue in relation to mental health is not harmful to plaintiff. Though the record consistently notes plaintiff's obesity, it provides only a few references to plaintiff's body image issues and her desire to lose weight. R. 578, 764. There is no evidence of plaintiff's obesity affecting her mental ability to perform work or complete daily life activities. Consequently, I find that the ALJ properly evaluated evidence of plaintiff's obesity and its potential effects on her mental health issues.

## ORDER

The Court does not doubt that Ms. Rundle's medical conditions are serious and affect her life significantly. However, after reviewing the record and the parties' briefs, I do not find that the arguments warrant a reversal of the ALJ's decision. Accordingly, the Court AFFIRMS the Commissioner's decision denying Ms. Rundle's application for DIB and SSI.

DATED this 29th day of July, 2019.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge